| | |
|---|---|
| **DONALD C. RUSCH**, | |
| Plaintiff, | **No. 10-CV-4110-DEO** |
| v. | |
| **MIDWEST INDUSTRIES INC., et al.**, | **Memorandum and Opinion Order** |
| Defendant. | |

_____

## I. INTRODUCTION AND BACKGROUND

Currently before this Court is Defendants'[1] motion for summary judgment against Plaintiff Donald C. Rusch's Complaint. Docket No. 26. Plaintiff alleges the following causes of action: (1) intentional interference with prospective business relations, (2) breach of fiduciary duties, (3) civil conspiracy, and (4) Employment Retirement Benefits Income Security Act (ERISA) violation.

In 1954, Byron L. Godbersen founded Midwest Industries, Inc. (hereinafter "Midwest Industries") in Ida Grove, Iowa.

---

[1] The Defendants are Midwest Industries Inc., Midwest Industries Inc. Supplemental Executive Retirement Plan, Susan Godbersen (f/k/a Susan Rusch), Lajune Godbersen, Bruce Godbersen, Beverly L. Corr, Ryan Bruce Godbersen, Jason Buns, Jon W. Devitt, Linda Harriman, and Andrew Brosius.

Docket No. 26-2, 1 and Docket No. 31-3, 1. Midwest Industries is incorporated in Delaware and "manufactures and markets boat trailers, lift, and dock products." Id.

In 1987, Byron Originals, Inc. (hereinafter "Byron Originals") was formed as a sister company of Midwest Industries and began manufacturing "fuel for use in remotely operated model aircraft and cars," as well as "plastic molded parts." Id.

Donald C. Rusch, Plaintiff, was an employee of Midwest Industries, Inc., for 35 years, until he was terminated on April 3, 2009. Docket No. 31-2, 1 and Docket No. 39-1, 1. When terminated, Plaintiff was Vice President of Marketing of Midwest Industries, as well as "an officer, shareholder, and voting director of both Midwest [Industries] and Byron Originals." Id.

Midwest Industries is a family owned corporation which Plaintiff became associated with through his marriage to Susan Godbersen, Byron Godbersen's, founder of Midwest Industries, daughter. Docket No. 26-2, 1. Defendants Lajune Godbersen, Bruce Godbersen, Beverly L. Corr, Ryan Bruce Godbersen, Jason Buns, Jon W. Devitt, Linda Harriman, and Andrew Brosius are also family members, as well as shareholders and board members

of Midwest Industries.[2]  Id. at 2-5.  In addition, some of the Defendants are officers of either Midwest Industries or Byron Originals:  Andrew Brosius is the President and CEO of Midwest Industries; Jon W. Devitt is the Vice President of Engineering of Midwest Industries; Jason Bun is the Vice President of Operations of Midwest Industries, Bruce Godbersen is the President and CEO of Byron Originals, and Ryan Godbersen is the Chief Operating Officer, Secretary, and Treasurer of Byron Originals.  Id.

"In 2008 through at least 2009, Midwest Industries was" going through "a financial crisis."[3]  Docket No. 31-2, 2. Also during this period, Plaintiff and his wife, Defendant Susan Godbersen (hereinafter "Susan"), began to have marital difficulties.  Id.  In December of 2008, Plaintiff, with permission from his boss, Defendant Andrew Brosius, began attending marriage counseling in Des Moines, Iowa.  Around

---

[2]  LaJune Godbersen was married to the late Byron Godbersen; Bruce Godbersen is Byron and LaJune's son; Beverly L. Corr is Byron and LaJune's grandaughter; Ryan Bruce Godbersen is Byron and LaJune's grandson;  Jason Buns is Byron and LaJune's grandson in-law; Jon W. Devitt is also Byron and LaJune's grandson in-law; and Linda Harriman is Byron and LaJune's daughter.  Docket No. 26-2, 2-5.

[3]  "In 2008, Midwest announced it would not pay bonuses to its executives, would not pay dividends, and was cutting the salary of its executives by ten percent."  Docket No. 31-2, 3.

this time, Plaintiff alleges that Susan "falsely told her" family members, as well as Plaintiff's co-workers, fellow directors and boss that Plaintiff "was having an extra-marital affair."[4]  Docket No. 31-2, 3.  It is also undisputed that around this time, there were rumors within the family that Plaintiff had made comments such as, "I hate my job . . . I [d]on't care about [Midwest Industries] . . . They can fire me," and an assortment of other negative and arguably insubordinate statements.  Docket No. 31-4, 18.  Plaintiff denies ever making these comments.

On January 28, 2009, Brosius, Susan, and Plaintiff had a meeting at Midwest Industries.  Plaintiff was placed on "a paid leave of absence with full pay and benefits" until March 28, 2009.  Docket No. 26-2, 5 and Docket No. 31-2, 5.  Brosius and other Defendants claim Plaintiff was placed on a leave of absence because of performance issues, including a general lack of engagement at work, excessive absences, difficulty with customers, poor decision making, failure to meet deadlines, general lack of leadership, and strained

---

[4] In a deposition, Andrew Brosius testified that Plaintiff initially denied having an affair but later told him that he had been lying to his family and other people he was close to about the affair, which Mr. Brosius took as an admission that Plaintiff was in fact having an affair.  Docket No. 31-4, 19.

work relations due to his marital problems with Susan.[5] Docket No. 31-2, 5-6 and Docket No. 39-1, 5.

While on his leave of absence, Plaintiff was instructed to develop a strategic marketing plan, think about how he might correct his damaged relationships with his co-workers and family members, and come up with ideas and present recommendations in relation to the new role he would assume at Midwest Industries after his leave of absence. Docket No. 26-2, 6 and Docket No. 31-3, 3. On February 5, 2009, six days after Plaintiff was placed on a leave of absence, Susan filed for divorce. Docket No. 31-2, 8.

On March 2, 2009, Defendants held a shareholders' meetings for both Midwest Industries and Byron Originals in which a new board of directors was elected. Docket No. 31-2. In both elections, Plaintiff was not included in the slate of candidates. Id. Other than Plaintiff, all the previous directors were re-elected. Id. In Plaintiff's place, the

---

[5] Plaintiff and Defendants largely disagree as to whether or not Plaintiff's work performance was in fact suffering, but, as Defendants note, "Plaintiff's termination was not a result of poor performance; rather, it was a result of Plaintiff not moving back to or commuting to Ida Grove to perform his job." Docket No. 39-1, 5. Therefore, since Defendant concedes Plaintiff was not terminated due to poor performance, whether or not Plaintiff's performance was in fact lacking is not a material issue before this Court.

shareholders elected Susan.  Docket No. 31-2, 8.

The bylaws of both Midwest Industries and Byron Originals "provide that [w]ritten or printed notice stating the place, day, and hour of" a shareholders' meeting "shall be delivered personally or by mail . . . to each shareholder.'"  Docket No. 31-2, 8 (quoting Bylaws of Midwest Industries, Article II, § 4).  Both parties agree that Plaintiff was not given notice of the shareholders' meeting of March 2, 2009, either personally or by mail.  However, Defendants note that Plaintiff was present at a December 15, 2008, shareholders' meeting where it was announced that the annual meeting would be held on March 2, 2009.  Docket No. 26-2, 11.  Defendants also note that Plaintiff was well aware that each year, Midwest Industries and Byron Originals held their annual shareholders' meetings some time from late March to early April.  Docket No. 26-2, 11.  Finally, Midwest Industries sent Plaintiff a notice of the shareholders' meetings via email to his work and personal accounts.  Docket No. 26-2, 10.  Plaintiff contends that he

did not receive these emails because of internet access issues.[6]

On April 2, 2009, Plaintiff spoke with Brosius and Jeffrey Ogren, Midwest Industries' Human Resources Director, over the phone to discuss Plaintiff's continued employment with Midwest Industries. Docket No. 31-2, 9 and Docket No. 26-2, 6. During the phone conference, both parties agree that Plaintiff suggested "he assume a marketing consultant role capable of being performed remotely from Des Moines," Iowa, where Plaintiff was then residing.[7] Docket No. 31-2, 10 and Docket No. 39-1, 8. According to Defendants, Plaintiff indicated he had moved to Des Moines and had no intention of returning to Ida Grove, Iowa. Docket No. 26-2, 6. However, Plaintiff contends that he merely expressed hesitancy about living in Ida Grove during his pending divorce because of a lack of housing options, never stated he would not move back to Ida Grove, and was not told that he would have to return to

---

[6] At Midwest Industries' and Byron Original's annual shareholders' meetings for 2010 and 2011, a board of directors identical to those elected at the 2009 shareholders' meeting were re-elected. Docket No. 26-2, 12.

[7] Plaintiff had entered into a three month lease on an apartment in Des Moines. Docket No. 31-2, 11 and Docket No. 39-1, 9. The lease had commenced on February 19, 2009, and ended on May 31, 2009. Docket No. 39-1, 9.

Ida Grove in order to keep his job.  Docket No. 31-2, 10-11.

Plaintiff also claims that Defendant Brosius inquired as to

whether Plaintiff and Susan would reconcile.  Upon learning

that Plaintiff considered reconciliation unlikely, Brosius

"stated that he was getting significant pressure from the

family to deal with" Plaintiff.[8]  <u>Id.</u> at 11.

On April 3, 2012, Plaintiff, Defendant Brosius, and Human

Resource's Manager Ogren had another telephone conference in

which Plaintiff was terminated ostensibly due to his refusal

to return or commute to Ida Grove.  Docket No. 31-2, 12,

Docket No. 26-2, 8; Docket No. 31-2, 10; and Docket No. 39-1,

8.  Both parties agree Plaintiff had adequately complied with

the conditions of his leave of absence.  <u>Id.</u>  Defendants claim

that Defendant Brosius made the sole determination to

terminate Plaintiff without participation from any of the

other Defendants, and that the decision to terminate Plaintiff

"had nothing to do with his marriage issues."  Docket No. 26-

2, 8.

---

[8] Defendants neither confirm nor deny this allegation.
In his deposition, Defendant Brosius stated that he does not
recall making the statement but does not dispute that he could
have made the statement.  Docket No. 31-2, 12 (citing Brosius'
Deposition pgs. 159-60; Plaintiff's App. at 33).

"Plaintiff's shares in Midwest Industries and Byron Originals were subject to" Buy-Sell Agreements. Docket No. 26-2, 12; <u>see</u> <u>also</u> Docket No. 31-3, 8. The Buy-Sell Agreements provide, in part, that upon termination of an employee whom is also a Midwest Industries' or Byron Originals' shareholder, the Corporations shall have the option to purchase their shares. Docket No. 26-3, 10 and 22. On April 28, 2009, "Midwest Industries and Byron Originals elected to and did purchase Plaintiff's shares." Docket No. 26-2, 13. Plaintiff notes that some of the Corporations' directors have expressed uncertainty as to whether purchasing Plaintiff's shares was a sound business decision. Docket No. 31-2, 13. The Defendant counters that the director/Defendants, though they may have had concerns related to the financial condition of the corporations, ultimately recognized that it was important to keep the shares in the Godbersen family and prevent the possibility of a hostile shareholder. Docket No. 39-1. The Midwest Buy-Sell Agreement, which Plaintiff bound himself to, specifically identifies that its primary purpose was "to maintain control of the Corporation within the family and to insure the continuation of the Corporation." Docket No. 26-3, 8.

"While employed as a Vice President for Midwest Industries, Plaintiff was a beneficiary of the Midwest Industries, Inc. Supplemental Executive Retirement Plan" (hereinafter the "Midwest Industries' Retirement Plan"). Docket No. 26-2, 14. The Midwest Industries' Retirement Plan provides for retirement benefits for a select group of Midwest Industries' "management and highly compensated employees." Docket No. 2-1, 16. All employees covered under the Plan who are still employees at the age of 60 are entitled to retirement benefits. Docket No. 2-1, 16, and Docket No. 26-2, 14. If an employee is still employed at the age of 65, employees are entitled to an additional lump sum payment. <u>Id.</u> Plaintiff claims that if he would have retired from Midwest Industries upon reaching the age of 65, "he would have been entitled to . . . $424,271." Docket No. 2-1, 16. However, if an employee entitled to benefits under the Plan is terminated prior to age 60, he is entitled to nothing. Docket No. 26-2, 15. At the time Plaintiff was terminated, he was 56 years old and was, therefore, no longer entitled to any benefits under the plan. <u>Id.</u>

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if the record shows

"there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P., Rule 56(c). A fact is *material* if it is necessary "to establish the existence of an element essential to [a] party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). There is a *genuine issue* as to a material fact if, based on the record before the court, a "rational trier of fact" could find for the non-moving party. <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

When considering a motion for summary judgment, a "court must view the evidence in the light most favorable to the nonmoving party . . . ." <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771 (8th Cir. 1995). This requires a court to draw any reasonable inference from the underlying facts in favor of the nonmoving party and to refrain from weighing the evidence, making credibility determinations, or attempting to discern the truth of any factual issue in a manner which favors the moving party unless there is no reasonable alternative. <u>See</u> <u>Matsushita</u>, 475 U.S. at 587; and <u>Morris v. City of Chillicothe</u>, 512 F.3d 1013, 1018 (8th Cir. 2008) (citing

<u>Thomas v. Corwin</u>, 483 F.3d 516, 526-27 (8th Cir. 2007).

Procedurally, the movant bears the initial burden "of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." <u>Hartnagel v. Norman</u>, 953 F.2d 394, 395 (8th Cir. 1992) (citing <u>Celotex</u>, 477 U.S. at 323). Once the movant has carried his burden, the non-moving party is required "to go beyond the pleadings" and through "affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 423 (citing Fed. R. Civ. P. 56(e)).

**III.   INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS**

Under Iowa law, the elements of intentional interference with prospective business relations are:

> 1.   The plaintiff had a prospective contractual relationship with a third person.
>
> 2.   The defendant knew of the prospective relationship.
>
> 3.   The defendant intentionally and improperly interfered with the relationship in one or more particulars.
>
> 4.   The interference caused either the

> third party not to enter into or to
> continue the relationship or that the
> interference prevented the plaintiff from
> entering into or continuing the
> relationship.
>
> 5.   The amount of damage.

Id. at 527 (citations omitted).

Plaintiff contends that Defendants, other than Midwest Industries and the Midwest Industries' Retirement Plan, "intentionally and improperly interfered with" Plaintiff's prospective business relationship with Midwest Industries to the extent that

> each used his or her authority as
> shareholders, directors and/or officers to
> interfere with [Plaintiff's] employment and
> prospective employment, strip him of his
> financial ownership interest in Midwest
> Industries and Byron Originals, and to
> purportedly remove [him] from the
> Companies' respective Boards.

Docket No. 2-1, 10.

**(A) The Purchase of Plaintiff's Shares Pursuant to the Buy-Sell Agreements and Plaintiff's Purported Removal from the Board of Directors**

After a thorough review of the record, this Court is persuaded that the purchase of Plaintiff's shares pursuant to the Buy-Sell agreement and the removal of Plaintiff from the Board of Directors were legitimate actions within Defendants'

rights as shareholders and directors of Midwest Industries and Byron Originals and signatories of the Buy-Sell Agreements; and, therefore, regardless of the Defendants' motivations, they are not properly subject to an intentional interference with prospective business relations claim. In other words, Plaintiff did not have a prospective contractual relationship which would have entitled him to remain a shareholder or director of Midwest Industries and Byron Originals, and Defendant's actions were not, legally speaking, improper, regardless of their motivations.

As an initial matter, Plaintiff was not removed from the Board of Directors of Midwest Industries but was simply not re-elected. Docket No. 26-2, 9-11. Furthermore, even if it were assumed that Plaintiff was removed, a director may be removed without cause at any time under Delaware law.[9] Del. Code § 141(k). A decision whether to re-elect or remove a board member is completely within the rights of shareholders and, though subject to corporate law, is not subject to tort law; so, it cannot be the basis of an intentional interference with business relations claim.

---

[9] Byron Originals and Midwest Industries are formed under Delaware law, and both parties concede that Delaware law is controlling in terms of corporate formalities.

14

In addition, once Plaintiff's employment was terminated at Midwest Industries, the Defendants had every right to purchase Plaintiff's shares under the terms of the Buy-Sell Agreements. Notably, Plaintiff voluntarily assented to the Agreements, and the Agreements provided that, upon termination of an employee whom is also a Midwest Industries' or Byron Originals' shareholder, the Corporations have an option to purchase said former employee's shares. Docket No. 26-2, 12; Docket No. 31-3, 8; and Docket No. 26-3, 10 and 22. Further, the Midwest Industries' Buy-Sell Agreement clearly provides that its primary purpose is "to maintain control of the Corporation within the family and to insure the continuation of the Corporation," which, in the context of a closely held corporation, is entirely legitimate. Outside of principles of contract law, this Court has no authority to second guess such agreements. However, whether or not Defendants intentionally interfered with or conspired to intentionally interfere with Plaintiff's employment status is a valid question in as far as the purchase of Plaintiff's shares was only possible through his termination, Plaintiff's loss of his shares may constitute consequential damages. Furthermore, though Defendants' motives for purposes of a tort cause of action are immaterial

in the context of tort law as it relates electing directors and purchasing shares in conformance with a buy sell agreement, the fact that their motives may have been wrongful may serve as evidence in support of the inference that they intentionally and improperly interfered with, Plaintiff's employment status. In this case, there are no contract rights such as those created by the Buy-sell Agreements, or shareholder rights, such as those created under Delaware law, protecting a decision to terminate Plaintiff for an improper purpose.

**(B) Whether Plaintiff's Termination was Based on Legitimate Business Considerations**

In order for a defendant's actions to constitute intentional and improper interference, "the defendant's sole motive" must have been "to financially injure or destroy the plaintiff." Dillon v. Ruperto, 786 N.W.2d 873, 2010 WL 238517 at 4 (Iowa Ct. App. 2010) (citations omitted). "'Conduct is generally not considered improper if it is fair and reasonable under the circumstances and done for a legitimate business purpose.'" Id. (quoting Holdworth v. Nissly, 520 N.W.2d 332, 336 (Iowa Ct. App. 1994). However, "[i]nterference achieved through conduct that is dishonest, fraudulent, malicious, or

otherwise wrongful will support a finding that the interference is improper." <u>Kern v. Palmer College of Chiropractic</u>, 757 N.W.2d 651, 663-64 (Iowa 2008).[10]  Both parties' briefs impliedly concede that if Plaintiff was fired because of his failing relationship with Susan, he was fired for an improper purpose.

Defendants contend that Andrew Brosius, Plaintiff's superior, fired Plaintiff because Plaintiff refused to commute or return to Ida Grove, Iowa, rather than for improper personal reasons.  If true, Defendant Brosius did not act out of an improper motive; and no other Defendant, regardless of their feelings in relation to Plaintiff, could be found the cause of Plaintiff's harms, and summary judgment would be

---

[10]Some of the factors a court should consider when determining whether interference with a Plaintiff's prospective business was improper are:

(a)  the nature of the actors conduct,
(b)  the actor's motive,
(c)  the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f)  the proximity or remoteness of the actor's conduct to the interference, and
(g) the relation between the parties.

<u>Id.</u> (citations omitted).

appropriate as to each Defendant.

As previously noted, Plaintiff was placed on a leave of absence on February 2, 2009. A "Workout Plan" Brosius created to guide Plaintiff on his leave of absence required Plaintiff to "[d]evelop some thoughts and ideas on a new role that he will fill when he returns to work." Docket No. 31-6, 176.

On April 2, 2009, Brosius, and Jeffrey Ogren, Midwest Industries' Human Resources Director, had a conversation with Plaintiff via telephone concerning Plaintiff's future role at Midwest Industries. Docket No. 31-2, 9 and Docket No. 26-2, 6. Brosius admits that up to this point, Plaintiff had successfully complied with the terms of his leave of absence. In the phone conversation of April 2, Plaintiff suggested "he assume a marketing consultant role capable of being performed remotely from Des Moines," Iowa. Docket No. 31-2, 10 and Docket No. 39-1, 8. Defendants claim that Plaintiff indicated he had moved to Des Moines and had no intention of returning to or commuting to Ida Grove. Docket No. 26-2, 6. Plaintiff, however, claims that he merely expressed hesitancy about living in Ida Grove during his pending divorce because of a lack of housing options, never stated he categorically rejected moving back to Ida Grove, and was not told that he

18

would have to return to Ida Grove in order to keep his job. Docket No. 31-2, 10-11. The very next day, Brosius terminated Plaintiff over the phone, ostensibly due to his refusal to return or commute to Ida Grove.

After careful consideration of the record, this Court is persuaded that a reasonable jury could conclude that Brosius' purported justification for firing Plaintiff was a mere pretext meant to obfuscate Brosius' true motives. There are multiple facts of record supporting the inference that Brosius fired Plaintiff based on improper personal considerations. For instance, Susan, though she was in no manner actively engaged in Midwest Industries' business, was, along with Brosius, the only other person present at the meeting of February 2nd where Plaintiff was placed on administrative leave. Docket No. 31-2, 7. Prior to being placed on administrative leave, Plaintiff had never had a negative performance report and no one had informed him that his performance was lacking, though it was standard procedure at Midwest Industries to give an employee notice and an opportunity to make amends when he was performing in an unsatisfactory manner. Docket No. 31-2, 6. In addition, just days after Plaintiff was placed on leave, Susan filed for

divorce.  A month prior to Plaintiff's termination, Defendants chose not to re-elect Plaintiff to the Board of Directors of Midwest Industries and Byron Originals, though he and others with jobs similar to his were re-elected as a matter of course both in that election and in the past.  The shareholders elected Susan instead.  Furthermore, a Midwest Industries' memorandum, written prior to the telephone conference of April 2, 2009, indicates that, "[a]lthough issues" in Plaintiff's personal life "may be moving towards resolution, this did not go in the direction we had hoped it would."  Docket No. 31-2, 10.  During both the telephone conferences of April 2, 2009, and April 3, 2009, Plaintiff claims Defendant Brosius expressed dissatisfaction with Plaintiff's marital problems and, at one point, told Plaintiff he was getting pressure from the family "to deal with [Plaintiff]."  Docket No. 31-2, 11-12.  Overall, it is clear that as Plaintiff's marital situation became progressively worse, his career at Midwest Industries simultaneously disintegrated.  Docket No. 31-2, 2. Based on this evidence of record, a reasonable jury could conclude that Brosius' decision to terminate Plaintiff was based on improper personal considerations.

This Court is also persuaded that Brosius' purported

reason for terminating Plaintiff may well be suspect and is, therefore, a factual issue. Assuming, as this Court must, that Plaintiff did not flatly refuse to return to Ida Grove, it is difficult to believe that Brosius would end Plaintiff's 35 year tenure with Midwest Industries without first providing Plaintiff an ultimatum to return to Ida Grove. Further, Plaintiff's suggestion that he work remotely was in compliance with the terms of the Workout Plan; that is, he was instructed to suggest a _new_ role he could perform when he returned, and this is precisely what he did. An employer, if they did not like Plaintiff's suggestion, would have proposed an alternative or, at least, made its terms known. The fact that Brosius expressed no ideas of his own related to Plaintiff's future role at the Corporation suggests the decision to terminate Plaintiff had been made before the phone conversation of April 2, 2009. Thus, Defendant's motion for summary judgment based on Plaintiff's termination for legitimate business reasons is denied.

**(C) Whether Defendant Brosius is Entitled to Qualified Immunity**

Defendants contend that Brosius, as an employee of Midwest Industries, is entitled to qualified immunity. In

<u>Grimm v. US West Communications Inc.</u>, the Iowa Supreme Court ruled that supervisors/employees are generally entitled to qualified immunity for their roles in terminating co-workers so long as their actions fall within the scope of their employment. 644 N.W.2d 8, 12 (Iowa 2002).[11] Only if there is evidence that the supervisor/employee's actions constituted "bad faith, fraud, or improper means" can a co-worker/plaintiff who was terminated maintain a cause of action for intentional interference with prospective business relations. <u>Id.</u> (Citing <u>Bossuyt v. Osage Farmers Nat'l Bank</u>, 360 N.W.2d 769, 778 (Iowa 1985).

After considering the relevant case law, this Court has difficulty determining what, if any, added protection the doctrine of supervisor/employee qualified immunity provides to a supervisor/employee who played a role in the termination of a colleague. As previously noted, in order to establish a *prima facie* case for intentional and improper interference with prospective business relations, a plaintiff must

---

[11] <u>Grimm</u> specifically dealt with intentional interference with contract, not intentional interference with prospective business relations. Plaintiff was not a contract employee; however, this Court can think of no reason why a supervisor/employee would be entitled to the defense of qualified immunity when there is a contract involved but not entitled to the defense of qualified immunity when the co-worker terminated was an at will employee.

establish that a defendant sought "to financially injure or destroy the plaintiff." Dillon v. Ruperto, 786 N.W.2d 873, 2010 WL 238517 at 4 (Iowa Ct. App. 2010) (citations omitted). Furthermore, "[i]nterference achieved through conduct that is dishonest, fraudulent, malicious, or otherwise wrongful will support a finding that" the alleged interference was "improper." Kern v. Palmer College of Chiropractic, 757 N.W.2d 651, 663-64 (Iowa 2008). Thus, qualified immunity appears to be built into the basic elements necessary to sustain an intentional interference with prospective business relations claim.

As determined in the previous section of this Memorandum and Opinion Order, a jury could reasonably conclude that Brosius' purported reason for terminating Plaintiff was a pretext meant to divert attention from improper considerations related to Plaintiff's personal life; so, a jury could also reasonably conclude that he did so in bad faith. Therefore, Defendant's motion for summary judgment based on supervisor/employee qualified immunity is denied.

**(D) Whether Sarah Godbersen Intentionally and Improperly Interfered with Plaintiff's Business Relations**

Defendants contend that Susan may not be held liable because her actions did not influence Brosius' decision; and, even assuming they did, they were not improper under the circumstances.

Plaintiff claims Susan exhibited "evident disdain" for and "used profanity when discussing" him "around family members." Docket No. 31-1, 8. Defendants concede that Susan told some of the other Defendants that Plaintiff was having an affair and that those other Defendants disseminated the allegations of the affair throughout the family and business. Docket No. 31-2, 3-4. Plaintiff also maintains that the allegations of an affair were untrue. Id. It is also clear that "Brosius was told that [Plaintiff] said things such as 'I hate my job', 'I don't care about Midwest Industries', and 'they can fire me,'" which, some Defendants have conceded more than likely came from Susan. Docket No. 31-1, 9. Plaintiff also maintains that he never made these statements. Finally, in a sworn affidavit to the court overseeing Susan and Plaintiff's divorce proceedings, Susan made disparaging and, at the very least, exaggerated averments in relation to

Plaintiff's work ethic and history with Midwest Industries. Since Susan was willing to go so far as to swear to statements which disparaged Plaintiff's work ethic to a court of law, a reasonable jury could conclude that she was also willing to make the same, if not worse, statements to her family members - Plaintiff's colleagues.  Docket No. 31-1, 9.[12]

It is a forgone conclusion that divorce is often an extremely unpleasant and upsetting event.  This Court also understands that persons going through a divorce cannot be expected to refrain from communicating with family.  However, in the unfortunate event that a divorce's family members are also colleagues with the other person involved in the divorce, it is unquestionably improper for them, as is alleged here, to make false statements related to the personal and work ethics and professionalism of that other person.  Of course, it is not certain that Susan made false statements when communicating with Plaintiff's colleagues, but a reasonable

_____

[12] Susan's affidavit states:  "'[Plaintiff] has not taken care of business at Midwest Industries;'" Plaintiff "'failed to show up for work in November, December [2008] and January [2009]' because he was 'running around with his girlfriend or entertaining his girlfriend;'" and Brosius told Plaintiff "'that under the circumstances of his recent work ethic, if [Plaintiff] wouldn't resign he was going to have to terminate him.'" Docket No. 31-2, 17 (quoting Susan's Affidavit at Docket No. 31-4, 226).

jury, based on the record, could so conclude.  Finally, since there is a genuine issue as to whether Brosius terminated Plaintiff based on improper personal considerations, and there is evidence suggesting Susan was primarily responsible for interjecting personal concerns into Plaintiff's work place, a reasonable jury could also conclude that Susan's alleged conduct was, legally speaking, a cause of Plaintiff's termination.

**(E) Defendants LaJune Godbersen, Bruce Godbersen, Beverly L. Corr, Ryan Bruce Godbersen, Jason Buns, Jon W. Devitt, and Linda Harriman**

Plaintiff contends that the above named Defendants are liable for intentional and improper interference based on a conspiracy theory.  As previously noted, all of these Defendants are members of the Godbersen family, as well as directors and shareholders of Midwest Industries and Byron Originals; and some of them are employees of either Midwest Industries or Byron Originals.

Under Iowa civil conspiracy law,

> a person becomes subject to liability for harm caused by the tortious conduct of another when that person:  (a) does a tortious act in concert with the other or pursuant to a common design with the other (traditional conspiracy); or (b) knows that

> the other's conduct constitutes a breach of
> duty and gives substantial assistance or
> encouragement to the other in such conduct
> (aiding and abetting).

Ezzone v. Riccardi, 525 N.W.2d 388, 398 (Iowa 1994) (citing Restatement (Second) of Torts § 876).

After thorough review of the record, this Court is persuaded that Plaintiff has failed to present sufficient evidence to support a reasonable inference that these director and shareholder Defendants conspired with Brosius or Susan, that they knew that Susan's or Brosius' actions constituted a breach of duty, or that, even if they knew Susan's and Brosius' actions constituted a breach of duty, they aided Susan and Brosius in breaching their duties. While a conspiracy may be proven by direct or circumstantial evidence, if circumstantial, as here, that evidence cannot be limited to evidence consistent with the actions of innocent individuals if it is to support the reasonable inference of a conspiracy. In general, Plaintiff relies on portions of the record which do little more than depict Defendants engaging in conduct one would expect from family and co-workers.

For instance, Plaintiff notes that some of the Defendants spoke with Brosius prior to Brosius' decision to place Plaintiff on a leave of absence; after putting Plaintiff on a

leave of absence, Brosius e-mailed some of the Defendants; and some of the Defendants indicated Plaintiff had some performance issues at work. There is nothing unusual about high level employees in a corporation discussing the possibility of placing a fellow employee on a leave of absence, communicating via e-mail once the decision to place the employee on a leave of absence is made, or discussing the performance issues of that employee. In addition, Plaintiff does not allege that any of these intra-company communications directly revealed any wrongful motive or an agreement to terminate Plaintiff for improper reasons. In the end, these director and shareholder Defendants discussed Plaintiff's employment status through normal channels and in an appropriate manner entirely consistent with their jobs.

Plaintiff also notes that some of the Defendants discussed Plaintiff's marital issues amongst themselves and repeated some of Susan's allegedly false statements about Plaintiff's personal life and feelings about work. There is nothing unusual about people discussing the marriage difficulties of a fellow family member. In fact, it would be unusual if they did not discuss and show concern for Susan's situation. Furthermore, Plaintiff does not allege and has

failed to identify any evidence indicating that Defendants knew that Susan's statements, which some of the Defendants repeated, were false. Therefore, there is no evidence indicating that they knew her statements constituted a breach of duty.

Plaintiff also notes that Defendants cooperated to purchase Plaintiff's shares in the corporation once he was terminated. As previously noted, once Plaintiff was terminated, the Defendants had a right, under the terms of the Buy-Sell Agreement, to purchase Plaintiff's shares. Their exercise of that right was contemplated within the Agreements and simply does not sufficiently support the inference that they also conspired to terminate Plaintiff's employment for improper purposes.

Though Brosius indicated Plaintiff complied with the terms of his leave of absence, Plaintiff also notes that some of the Defendants thought Plaintiff did not comply with the terms of his leave of absence. Docket No. 31-1, 11-16. However, there is neither any indication that their beliefs were insincere or somehow affected Brosius' decision to terminate Plaintiff, nor that they were part of a concerted effort to terminate Plaintiff for improper purposes. On the

contrary, the fact that some Defendants thought Plaintiff was terminated for legitimate reasons supports the inference that there was no conspiracy.

Finally, in relation to LaJune Godbersen, Plaintiff notes that she has been uncooperative in her depositions and submitted an errata sheet in which each of her answers were subsequently altered. Docket No. 31-1, 13-14. While this evidence may raise questions related to LaJune's reliability or credibility as a witness, they are, in the opinion of this Court, insufficient to sustain a cause of action for conspiracy against her. First, these events occurred in 2011 and simply are not sufficiently probative of whether she was involved in a conspiracy to terminate Plaintiff for improper reasons in 2009. Second, other than noting that the changes to the errata sheet were suspicious, Plaintiff fails to indicate what the changes were attempting to hide or how they relate to whether or not LaJune was engaged in a conspiracy to terminate Plaintiff for improper purposes. Finally, LaJune, though the primary shareholder of Midwest Industries, is 84 years old and does not actively participate in either Corporations' day-to-day operations. Plaintiff, other than pure speculation, has failed to identify any evidence that

LaJune was involved, on any level, with Brosius' decision to terminate Plaintiff.

**(F) Conclusion**

Defendants LaJune Godbersen, Bruce Godbersen, Beverly Corr, Ryan Godbersen, Jason Buns, Jon W. Devitt, and Linda Harriman's normal business actions and typical family discussions are insufficient to give rise to the reasonable inference that they conspired to terminate Plaintiff for improper reasons. Plaintiff's intentional interference with business relations claim against these Defendants relies on the hidden premise that in certain personal contexts, individuals will digress to such a level of nastiness that it is reasonable to infer that they have engaged in tortious conduct. While such digression certainly occurs in the context of broken families, it does not always occur. An unsupported assumption grounded in the baser aspects of human nature simply cannot be used to sustain a cause of action in a court of law. While there is evidence that Brosius acted pursuant to pressure from the family, which family members applied the pressure is unclear. This Court simply cannot subject all of the Defendants to the rigors of our legal system absent evidence that they, as individuals, were

sufficiently involved in the decision to terminate Plaintiff. Plaintiff has failed to identify a single overt act of any of the Defendants, other than Brosius and Susan, which reasonably supports the inference that they intentionally and improperly interfered with his prospective employment or conspired with or aided Susan or Brosius to do so. Therefore, Defendants' motion for summary judgement of Plaintiff's cause of action as to Defendants LaJune Godbersen, Bruce Godbersen, Beverly Corr, Ryan Godbersen, Jason Buns, Jon Devitt, and Linda Harriman for intentional interference with prospective business relations is hereby granted.

However, Defendant has presented evidence supporting the reasonable inference that Susan was making false accusations related to Plaintiff's personal and professional life which sufficiently influenced the decision to terminate Plaintiff; and Brosius' purported reason for terminating Plaintiff was a pretext designed to obfuscate those improper considerations. Therefore, Defendants' motion for summary judgment of Plaintiff's intentional interference claim in relation to Defendants Brosius and Susan is hereby denied.

## IV.  BREACH OF FIDUCIARY DUTIES

Plaintiff contends that Defendants LaJune Godbersen,

Bruce Godbersen, Beverly L. Corr, Ryan Godbersen, Jason Buns, Jon Devitt, Linda Harriman, Andrew Brosius, and Susan Godbersen, as shareholders and voting directors of Midwest Industries and Byron Originals,[13] violated their fiduciary duties owed to Plaintiff as a minority shareholder.  Docket No. 2-1, 11-12.  Specifically, Plaintiff claims Defendants breached their fiduciary duties of fairness and care owed to Plaintiff when they terminated him as an employee, purchased his shares pursuant to the Buy-Sell Agreement, and did not re-elect him as a director.[14]  Id.

## A. Plaintiff's Termination

As previously noted, Plaintiff was fired by Defendant Brosius who was acting under his authority as Plaintiff's superior, rather than a shareholder or director.  There is no indication on record that any of the Defendants, acting in their capacities as shareholders or directors, influenced Brosius' decision.  Simply stated, the decision to terminate Plaintiff was an officer decision subject to tort and

---

[13] Susan Godbersen, because she was not a director of Midwest Industries or Byron Originals until she replaced Plaintiff, is not subject to some of Plaintiff's breach of fiduciary duty claims.

[14] Both parties concede that because Byron Originals and Midwest Industries were incorporated in Delaware, Delaware law is controlling.

employment law, not a decision made by the Board of Directors or by vote of the Shareholders and not subject to corporate law. Therefore, director and shareholder Defendants' motion for summary judgment as to Plaintiff's claim for breach of fiduciary duty in relation to Plaintiff's termination is granted.

**B. Plaintiff's Purchase of Shares Pursuant to the Buy-Sell Agreements**

As previously noted, the Buy-Sell Agreements were valid Agreements Plaintiff voluntarily assented to. Actions taken in conformance with the terms of the Agreements cannot, in and of themselves, constitute a tort. However, Plaintiff implies that because the purchase of his shares was not a sound business decision, it constituted a breach of the fiduciary duty of care and fairness. Docket No. 31-2, 13. Plaintiff does not contend and fails to identify any evidence that the purchase of his shares was in fact a poor business decision. He merely notes that some of the Corporations' directors expressed doubt as to whether the purchase of his shares was a good decision; however, after reviewing the directors' relevant testimony, it is apparent to this Court that they ultimately believed they were acting in the Corporations' best

interests.

Delaware law recognizes the business judgment rule whereby it is presumed that directors, in making business decisions, "acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." McMullin v. Beran, 765 A.2d 910, 916 (Del. Supr. 2000). In order to overcome the presumption that directors' actions were legitimate, a "plaintiff must effectively provide evidence that the defendant[s] . . . in reaching [their] challenged decision, breached" a fiduciary duty. Id. at 17. The fact that some of the Defendants expressed moderate doubt as to the wisdom of purchasing Plaintiff's shares simply does not constitute evidence that there was a breach of fiduciary duty. If anything, it constitutes evidence that the Defendants made their decision after properly considering the potential drawbacks of their decision. When a plaintiff fails to provide sufficient evidence of an actual breach of duty, "'the business judgment rule attaches' and operates to protect the individual director-defendants from personal liability . . . ." Id. (quoting Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 361 (Del. Supr. 1993). Therefore, director and shareholder

Defendants' motion for summary judgment as to Plaintiff's breach of fiduciary duty claims for the purchase Plaintiff's shares is granted.

**C.    Failure to Re-elect Plaintiff to the Board of Directors**

As previously noted, under Delaware law, shareholders have a right not to re-elect or remove a director for whatever reason. Del. Code § 141(k). A shareholder's decision not to re-elect a previous director for personal reasons cannot constitute, in and of itself, a breach of fiduciary duty. In order to establish a breach of fiduciary duty, a plaintiff must produce additional evidence that the decision was not in the corporation's best interests. In this case, Plaintiff introduces no such evidence. However, Plaintiff does contend that a breach of fiduciary duty arose, not from the decision to elect another in his place, but from the fact that he was not given proper notice of the elections.

The by-laws of the Corporations provide that "'Written or printed notice stating the place, day, and hour of the meeting . . . shall be delivered . . . personally or by mail . . . to each shareholder.'" Docket No. 31-1, 18 (citing Docket No. 31-2, 8). Though Defendants did attempt to provide Plaintiff

notice, they concede that it was not in comportment with the Corporate by-laws.

While, technically speaking, invalid notice destroys the validity of director or member meetings and nullifies all corporate actions taken therein. Plaintiff does not pray for this Court to deem the 2009 elections null and void. Rather, Plaintiff prays for compensatory damages based on breach of fiduciary duty. Nevins v. Bryan, 885 A.2d 233, 245 (Del. Ch. 2005) and Docket No. 2-1, 11-14. Even if Plaintiff were to ask this Court to nullify the 2009 elections and all subsequent corporate actions, Plaintiff's victory would be purely academic and have almost no practical consequence in the long run because Defendants could simply hold a new election after giving Plaintiff notice in conformity with the Corporations' By-laws; thus, ratifying the 2009 elections and all subsequent Corporate actions.[15] Id.

---

[15] Invalid corporate actions are either void or voidable. Nevins v. Bryan, 885 A.2d 233, 245 (Del. Ch. 2005). Void acts are acts that were never in the corporations best interests, such as "fraudulent gifts or waste of corporate assets." Michelson v. Duncan, 407 A.2d 211, 218 (Del. 1979). Void acts cannot be subsequently ratified by valid shareholder approval. Id. Voidable acts are acts "performed in the interest of the corporation" but which were accomplished without following corporate formalities or were otherwise beyond the scope of managements' authority. Id. Voidable acts may be subsequently ratified by valid shareholder approval. Defendants claim that the board elections of March 2, 2009,

There does not seem to be any case law indicating directors are individually responsible for providing notice to shareholders prior to shareholder meeting or that a failure to provide notice constitutes a breach of fiduciary duty as to each director of a corporation. As discussed at the hearing of April 4, 2012, corporate secretaries are responsible for providing proper notice, not individual directors. Furthermore, though not technically in compliance with the Corporations' By-laws, Plaintiff was sent two e-mails, one to his business account and one to his personal account, informing him of the elections of March 2, 2009. Plaintiff was also aware that the Annual Shareholder Meeting took place in late April or early March of each year. At the previous board meeting of December 15, 2008, Plaintiff and the other directors set the annual shareholder meeting for March 2,

---

were subsequently ratified by the 2010 and 2011 elections; however, by the time of the 2010 and 2011 elections, Plaintiff's shares were purchased by the board of directors elected under a cloud of faulty notice on March 2, 2009, and so Plaintiff was still not given proper notice of the 2010 and 2011 elections, and so they do not constitute valid shareholder ratification. However, both parties concede that the elections of March 2, 2009, were voidable, rather than void, and so even if this Court were to conclude that all corporate actions have been ultra vires since 2009, Defendants could and, all signs indicate, would simply ratify the 2009 election by providing proper notice to the 2009 shareholders, including Plaintiff, and holding a new election.

2009.  These facts indicate there was no concerted effort to somehow prevent Plaintiff from exercising his rights as a shareholder, especially considering any exercise of those rights would have been futile.  This Court is persuaded that a reasonable jury could not conclude that the directors' failure to individually give Plaintiff notice in strict compliance with the Corporations By-laws constituted a breach of fiduciary duty.

Furthermore, Plaintiff concedes that he was not paid as a director and fails to allege what financial benefit he received from being a director.  "Damages resulting from breaches of fiduciary duty are to be liberally calculated, and will be awarded as long as there is a basis for estimating damages." Hampshire Group, Ltd. v. Kuttner, 2010 WL 2739995, at 50 (Del. Ch. July 12, 2010).  However, a plaintiff still has the burden to prove damages by a preponderance of the evidence, and a court "may not set damages based on mere 'speculation or conjecture' where a plaintiff fails to adequately prove damages." Beard Research, Inc. v. Kates, 8 A.3d 573 (Del. Ch. 2010) (quoting Medek v. Medek, 2009 WL 200535365, at 12 n. 78 (Del. Ch. July 1, 2009).  In this case, Plaintiff fails to allege that he experienced any damages

related to the election of March 2, 2009, and the record does not suggest any damages. Thus, summary judgment for the director shareholder Defendants is appropriate as to Plaintiff's breach of fiduciary duty claim for failure to re-elect him in accordance with proper procedures.

## V.  CIVIL CONSPIRACY

Plaintiff alleges that

> [s]ome or all of the defendants participated in a conspiracy to interfere with [Plaintiff's] employment and prospective employment at Midwest Industries, to remove him from the boards of directors without notice or due process, and to otherwise strip him of all economic benefits derived from his many years of service to Midwest Industries and Byron Originals, all for the purpose of causing financial injury . . . .

Docket No. 2-1, 16.

As previously noted, under Iowa law,

> a person becomes subject to liability for harm caused by the tortious conduct of another when that person:  (a) does a tortious act in concert with the other or pursuant to a common design with the other (traditional conspiracy); or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other in such conduct (aiding and abetting).

Ezzone v. Riccardi, 525 N.W.2d 388, 398 (Iowa 1994) (citing Restatement (Second) of Torts § 876).

## A. Plaintiff's Termination

As previously discussed in Section III(E) of this Memorandum and Opinion Order, Plaintiff has only presented evidence indicating that Defendants LaJune Godbersen, Bruce Godbersen, Beverly Corr, Ryan Godbersen, Jason Buns, Jon Devitt, and Linda Harriman discussed business and family issues amongst themselves in an appropriate manner entirely consistent with the actions of typical family members and co-workers. Plaintiff has failed to present any evidence indicating these Defendants were aware that some of the information they were sharing was false, fraudulent, or otherwise malicious, or that they engaged in any overt act indicative of a conspiracy between themselves and Susan or Brosius to terminate Plaintiff for an improper purpose. Therefore, as previously noted, summary judgment as to Plaintiff's claim for civil conspiracy in relation to Plaintiff's termination as to these Defendants is granted.

However, a reasonable jury could conclude that Susan and Brosius, as family members and business partners, acted in concert to terminate Plaintiff for an improper purpose. As previously noted, Susan, though she was not actively involved in Midwest Industries' business, was present, along with

Brosius, at the meeting where Plaintiff was put on a leave of absence. Since it is apparent that Brosius and Susan were communicating, and a reasonable jury could conclude that Susan and Brosius both intentionally and improperly interfered with Plaintiff's prospective business relations with Midwest Industries, a reasonable jury could also conclude that they did so together or in aid of each other's independent schemes.

**B.   The Board Elections and Purchase of Plaintiff's Shares**

Under Iowa law, a "'[c]ivil conspiracy is not in itself actionable; rather it is the'" injuries caused "'in furtherance of the conspiracy [that] give rise to the action.'" <u>Wright v. Brooke Group, Ltd</u>, 652 N.W.2d 159, 171 (Iowa 2002) (quoting <u>Basic Chems., Inc. v. Benson</u>, 251 N.W.2d 220, 233 (Iowa 1977). In other words, a conspiracy consists of an agreement to commit "an unlawful end or a lawful end by unlawful means." <u>Tubbs v. United Cent. Bank</u>, 451 N.W.2d 177, 183-84 (Iowa 1990) (citation omitted). Furthermore, "[t]he principal element of a conspiracy is an agreement to or understanding to effect a wrong against another." 451 N.W.2d at 184 (citations omitted).

As previously noted, Defendants neither did anything

inherently unlawful when they purchased Plaintiff's shares pursuant to the Buy-Sell Agreements, nor when they failed to re-elect Plaintiff as a director; both actions were well within their rights as directors and shareholders. Furthermore, in purchasing Plaintiff's shares, Defendants followed the procedures validly provided for in the Buy-Sell Agreements, and so their conduct does not constitute unlawful means. Finally, though the director elections of March 2, 2009, were, in the sense that Plaintiff was not given notice in strict compliance with the Corporation's by-laws, in some degree done by unlawful means, the individual Defendants had no duty to give Plaintiff notice, and there is no evidence on record indicating that they came to an agreement or understanding or otherwise aided each other in a scheme not to give Plaintiff proper notice or even knew that Plaintiff had not been given proper notice. Therefore, Defendants' motion for summary judgment is hereby granted.

## VI. EMPLOYMENT RETIREMENT BENEFITS INCOME SECURITY ACT (ERISA)

Plaintiff claims that Defendants Midwest Industries and Midwest Industries Supplemental Executive Retirement Plan (the "Retirement Plan") interfered with his retirement benefits in

43

violation of ERISA.  Docket No. 2-1, 15-17.

29 U.S.C. § 1140 provides that

> [i]t shall be unlawful for any person to
> discharge . . . a participant . . . of an
> employee benefit plan . . . for the purpose
> of interfering with the attainment of any
> right to which such participant may become
> entitled under the plan . . . .

As an initial matter, Congress has defined the term "'person' as 'an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization.'" Bontrager v. Central States, Southeast and Southwest Areas Pension Fund, 2003 WL 22251407, at 6 (N.D. Iowa 2003) (quoting 29 U.S.C. §1002(9)).  Congress simply did not provide for a cause of action against retirement plans themselves but only individuals and organizations who operate or insure the plans.  Id. (citing Swanson v. U.A. Local 13 Pension Plan, 779 F. Supp. 690, 702 (W.D. N.Y. 1991).  Thus, Defendants' motion for summary judgment against the Retirement Plan is granted; however, both parties concede that Midwest Industries is a proper defendant under an ERISA claim.

> An ERISA based retaliation or interference
> claim can be established through direct
> evidence, or in the absence of direct
> evidence, through the McDonnell Douglas
> three-part burden shifting framework common

44

to Title VII . . . cases.

Manning v. American Republic Ins. Co., 604 F.3d 1030, 1042 (8th Cir. 2010) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Both parties concede that there is no direct evidence and McDonnell Douglas' burden shifting applies. Under the McDonnell Douglas burden shifting framework, a plaintiff must first establish a *prima facie* case, then "the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its action." Id. If the employer establishes a legitimate non-discriminatory reason for its action, "the burden [then] shifts back to the claimant to prove that the proffered reason is pretextual." Id.

A *prima facie* case of ERISA interference with retirement benefits consists of proof that: (1) claimant participated in a statutorily protected plan; (2) employer took an adverse employment action; and (3) there is a causal connection between claimant's participation in the plan and the adverse employment action. Id. at 1043. Both parties concede that claimant has established the first two elements, but Defendant contends that Plaintiff has failed to show that there is a causal connection between Plaintiff's termination and his participation in the Retirement Plan. Specifically, Defendant

contends that Plaintiff has failed to show that Defendant "'had a specific intent to interfere with [his] benefits.'" Pendleton v. Quick Trip Corp., 567 F.3d 988, 992 (8th Cir. 2009) (quoting Register v. Honeywell Fed. Mfg. & Tech., L.L.C., 397 F.3d 1130, 1137 (8th Cir. 2005). As previously determined in Section III(B) of this Memorandum and Opinion Order, a reasonable jury could conclude that Brosius, acting as agent for Midwest Industries, terminated Plaintiff for personal reasons in order to financially injure Plaintiff. Thus, since Plaintiff's retirement benefits were a large part of Plaintiff's financial future, a reasonable jury could also conclude that Brosius, acting on behalf of Midwest Industries, had the specific intent to interfere with Plaintiff's benefits.

Defendant, as was also discussed in Section III(B) of this Memorandum and Opinion Order, claims it fired Plaintiff because he refused to return to Ida Grove, which, if true, would constitute a legitimate reason for terminating Plaintiff. However, as previously determined, a reasonable jury could conclude that Defendant's purported reason for

terminating Plaintiff was a mere pretext. Thus, Defendants'
motion for summary judgment is denied.

## VII. CONCLUSIONS

**(1)** Defendants' motion for summary judgment as to Plaintiff's
intentional interference with prospective business relations
claim against LaJune Godbersen, Bruce Godbersen, Beverly Corr,
Ryan Godbersen, Jason Buns, Jon Devitt, and Linda Harriman is
granted;

**(2)** Defendants' motion as to Plaintiff's intentional
interference with prospective business relations claim against
Susan Godbersen and Andrew Brosius is denied;

**(3)** Defendants' motion as to Plaintiff's breach of fiduciary
duty claims against all Defendants is granted.

**(4)** Defendants' motion as to all of Plaintiff's civil
conspiracy claims against LaJune Godbersen, Bruce Godbersen,
Beverly Corr, Ryan Godbersen, Jason Buns, Jon Devitt, and
Linda Harriman is granted;

**(5)** Defendants' motion as to Plaintiff's civil conspiracy
claim against Andrew Brosius and Susan Godbersen for
exercising the corporate right to purchase Plaintiff's shares
and failure to re-elect Plaintiff as a director is granted;

**(6)** Defendants' motion as to Plaintiff's civil conspiracy claim against Andrew Brosius and Susan Godbersen for intentionally interfering with Plaintiff's prospective business relations with Midwest Industries is denied;

**(7)** Defendants' motion as to Plaintiff's ERISA claim against the Retirement Plan is granted;

**(8)** Defendants' motion as to Plaintiff's ERISA claim against Midwest Industries is denied; and

**(9)** Defendants' motion to continue the trial date "to allow both parties the opportunity to engage in trial preparation consistent with the Court's decision on the pending Motion for Summary Judgment" (Docket No. 47) will come before this Court for hearing after the parties have had an opportunity to review this Order. The telephonic hearing will take place on **Friday, May 4, 2012, at 11:00 a.m.**, and the parties shall promptly supply appropriate contact information for participation in this hearing, 712-233-3916.

IT IS SO ORDERED this 1st day of May, 2012.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa